IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.:  8:21-CV-02541-TPB-AAS

COLONY INSURANCE COMPANY,

    Plaintiff,

v.

COASTAL CONSTRUCTION MANAGEMENT, LLC; ROSALYNE HOLDINGS, LLC; WPC III, Inc. d/b/a WINTER PARK CONSTRUCTION COMPANY,

    Defendants.

                                    /

## **COLONY INSURANCE COMPANY'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Colony Insurance Company (CIC) files this Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c) because "no issue of material fact exists, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings."

CIC has no duty to defend Coastal Construction Management (CCM) in the underlying litigation. The policies contain an exclusion for "property damage" "arising out of the rendering or failure to render any professional

service." The Underlying Complaint specifically alleges that a contract entitled "Professional Services Agreement" required CCM to act as a "construction manager," "make site inspections," "observe the status of constructive activity," "review quality and adherence to finish quality standards," "manage" the "punch list process with the design team," supervise "management and administration of the Project and construction of the improvements," "exercise . . . the skill, knowledge, and judgment in the performance of its services that is ordinarily employed by building professionals," and "ensure that WPC performed its work in compliance with: the Florida Building Code and other applicable codes; the prevailing industry standards; the permitted plans; the specifications; the shop-drawings and other submittals; manufacturers' requirements; and other approved Project documents." Based upon the allegations of the Underlying Complaint and the terms of the Policy, CIC has no duty to defend CCM.

## Statement of Undisputed Facts

1. This dispute arises from a Complaint filed by *Rosalyne Holdings, LLC v. WPC III d/b/a "Winter Park Construction Company*," Case No. 2017-CA-003299-NC, in the Circuit Court of the Twelfth Judicial District in and for Sarasota County, Florida. (the "Underlying Case").

2.      On October 17, 2019, Rosalyne Holdings (RH) filed a Second Amended Complaint in the Underlying Case with the Circuit Court in which it added CCM as a party to the Underlying Case. [D.E. 1-2]

3.      The Second Amended Complaint alleged:

"On or about April 27, 2015, ADG entered into a "Professional Services Agreement" with CCM for CCM to serve as construction manager and construction consultant for the Project." [D.E. 1-2, ¶ 9]. . .

"Pursuant to the CCM Contract 1, CCM agreed, in part, to '[m]ake site inspections to observe the status of constructive activity, carefully review quality and adherence to finish quality standards for all components of the Project' and to '[c]oordinate the punch-list process with the design team and [WPC], and manage same, to ensure a finished product of the quality we all require.' *Id.* . . .

"Effective September 30, 2016, CCM's services on the Project became subject to the terms of a "Letter of Understanding" between Rosalyne and CCM." *Id.* . . .

"Under the terms of CCM Contract 2, CCM was, in part, 'responsible for coordinating and supervising management and administration of the Project and construction of the improvements comprising the Project. . .' Further, CCM was responsible to ensure the quality of WPC's work to the standards specified in the Direct Contract." *Id.* . . .

"As the construction manager/construction consultant / owner's representative for the Project, CCM owed a common law duty to Rosalyne to exercise a reasonable degree of care, skill, knowledge, and judgment in the performance of its services that is ordinarily employed by building professionals in this or similar localities under the same or similar circumstances. This duty included but was not necessarily limited to exercising reasonable

care <u>to ensure that WPC performed its Work</u> in completing the Project in compliance with: the Florida Building Code and other applicable codes; the prevailing industry standards; the permitted <u>plans</u>; the <u>specifications</u>; the <u>shop-drawings</u> and other submittals; manufacturers' requirements; and other approved Project documents." [D.E. 1-2, ¶ 107].

(Emphasis added)

3. CIC issued two liability policies to CCM -- Policy #103 GL 0015769-01 effective October 15, 2017 to October 15, 2018 and Policy 103 GL 0015769-02 effective October 15, 2018 to October 15, 2019 (together, the "Policies"). **Exhibits B & C**.

4. The Policies include the following Exclusion:

This insurance does not apply to

**Professional Services**

any "bodily injury," "property damage" or "personal and advertising injury" arising out of the rendering or failure to render any **professional service**. This includes but is not limited to:

. . .

(2) preparing, approving, or failing to prepare or approve maps, <u>drawings</u>, opinions, reports, surveys, change orders, designs or <u>specifications</u>;

(3) <u>inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager</u>;

(4) engineering services, including related supervisory or inspection services;

. . .

> This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage," or the offense which caused the "personal and advertising injury" involved the rendering of or failure to render any professional service. (emphasis added).

## Legal Memorandum

### A. Standard of Review

A party may move for a judgment on the pleadings after the pleadings are closed. Fed. R. Civ. P. 12(c). "Judgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts." *Schmidt v. Fednat Ins. Co.*, No. 2:19-CV-41-FTM-29MRM, 2020 WL 7238149, at *1 (M.D. Fla. Dec. 9, 2020) (internal citation omitted).

The record includes the complaint, exhibits to the complaint, and documents "expressly incorporated into the complaint by reference…" or that are otherwise "integral" thereto, such as the Policy. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

### B. Duty to Defend

In order to determine an insurer's duty to defend an insured, the Court need only look at the allegations of the Complaint and the language of the

Policy. An insurer's duty to defend is "based on only the allegations of the underlying complaint." *Keen v. Florida Sheriffs' Self-Insurance*, 962 So. 2d 1021, 1024 (Fla. 4th DCA 2007). (citing *U.S. Fire Ins. Co. v. Hayden Bonded Storage Co.*, 930 So. 2d 686, 691 (Fla. 4th DCA 2006). "A liability insurance carrier must defend the insured only when the initial pleadings fairly bring the case within the scope of coverage." *Id.* (citing *State Farm Fire & Cas. Co. v. Tippet*, 864 So. 2d 31, 35 (Fla. 4th DCA 2003). Further, if the pleadings "show the applicability of a policy exclusion, the insurer has no duty to defend." *Id.*

    **C.**    <u>**CIC Has No Duty to Defend CCM because the Policy's Professional Services Exclusion Eliminates Coverage**</u>

The Policies issued to CCM provide:

> **EXCLUSION – PROFESSIONAL SERVICES**
>
> This insurance does not apply to:
>
> **Professional Services**
>
> any "bodily injury," "property damage" or "personal and advertising injury" arising out of the rendering or failure to render any **professional service**. This includes but is not limited to:
>
> . . .
>
> (2)    preparing, approving, or failing to prepare or approve maps, <u>drawings</u>, opinions, reports, surveys, change orders, designs or <u>specifications</u>;

  (3) <u>inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager;</u>

  (4) engineering services, including related supervisory or inspection services;

   . . .

  This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage," or the offense which caused the "personal and advertising injury" involved the rendering of or failure to render any professional service. (emphasis added) (**Exhibit B** page 54, **& C,** page 55).

The courts have consistently upheld and applied this exclusion. *See Witkin Design Grp., Inc. v. Travelers Prop. Cas. Co. of Am.*, 712 F. App'x 894 (11th Cir. 2017); *Est. of Tinervin v. Nationwide Mut. Ins. Co.*, 23 So. 3d 1232 (4th DCA 2012); *Hartford Cas. Ins. Co. v. Conrad & Scherer LLP*, No. 15-61360-CIV, 2015 WL 13260391 (S.D. Fla. Dec. 17, 2015).

In *Witkin*, an Eleventh Circuit Court of Appeals Decision applying Florida law, the insured was alleged to be a landscape architect. The policy contained an exclusion for property damage "arising out of the rendering or failure to render any "professional service." Travelers defined "professional service" as "any service requiring specialized skill or training, such as the services listed above."

The Travelers' policy provided the following examples of "professional services:

> "a. Preparation, approval, provisions of or failure to prepare, approve or provide any map, shop drawing, opinion, report, survey, field order, change order, design, drawing, specification, recommendation, warning, permit application, payment request, manual or inspection;
>
> b. Supervision, inspection, quality control, architectural, engineering or surveying activity or service, job site safety, construction contracting, construction administration, construction management, computer consulting or design, software development or programming service, or a selection of a contractor."

None of the examples expressly mention landscaping or landscape architecture. Nevertheless, the Eleventh Circuit concluded that there was "no 'genuine inconsistency, uncertainty, or ambiguity' as to what counts as a professional service" and applied the exclusion to the insured's work as a landscape architect. *Witkin at* 896.

CIC's exclusion is <u>identical</u> to the Travelers' exclusion. They both eliminate coverage for damage "arising out of the rendering or failure to render any **professional service**." The only difference between the Travelers' policy and CIC's Policy is the carriers' choice of examples, not the exclusionary language.

Although not identical, even the examples are similar. Paragraph 'a.' of the Travelers' examples is similar to Section (2) of the Professional Service Exclusion of the CIC Policy. Paragraph 'b.' of the Travelers' examples closely resemble Sections (3) and (4) in the CIC Policy.

CIC's example (2) uses:

> "preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;"

Travelers' examples are simply a few words after the word "specification:"

> "Preparation, approval, provisions of or failure to prepare, approve or provide any map, shop drawing, opinion, report, survey, field order, change order, design, drawing, specification, recommendation, warning, permit application, payment request, manual or inspection;"

CIC's example (3) and (4) use:

> (3)    inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager;
>
> (4)    engineering services, including related supervisory or inspection services;

Travelers' example b combines CIC's (3) and (4) and adds a few other examples:

> Supervision, inspection, quality control, architectural, engineering or surveying activity or service, job site safety,

> construction contracting, construction administration, construction management, computer consulting or design, software development or programming service, or a selection of a contractor."

The Travelers and CIC exclusions are identical. The examples, though slightly different, are simply examples. CIC's examples are simply more comprehensive. This Court should find that all of the alleged activities of CCM were professional services because they clearly "require a specialized skill or training" as made apparent from the examples provided by Colony's professional services exclusion.

The Second Amended Complaint specifically alleges that CCM contracted to coordinate and supervise the management and administration of a complex construction project. The Second Amended Complaint states:

> "On or about April 27, 2015, ADG entered into a "Professional Services Agreement" with CCM for CCM to serve as construction manager and construction consultant for the Project." [D.E. 1-2, ¶ 9]. . .

> "Pursuant to the CCM Contract 1, CCM agreed, in part, to '[m]ake site inspections to observe the status of constructive activity, carefully review quality and adherence to finish quality standards for all components of the Project' and to '[c]oordinate the punch-list process with the design team and [WPC], and manage same, to ensure a finished product of the quality we all require.' *Id.* . . .

> "Effective September 30, 2016, CCM's services on the Project became subject to the terms of a "Letter of Understanding" between Rosalyne and CCM." *Id.* . . .
>
> "Under the terms of CCM Contract 2, CCM was, in part, 'responsible for <u>coordinating and supervising management and administration</u> of the Project and construction of the improvements comprising the Project. . .' Further, CCM was responsible to ensure the quality of WPC's work to the standards specified in the Direct Contract." *Id.* . . .
>
> "As the <u>construction manager/construction consultant</u> / owner's representative for the Project, CCM owed a common law duty to Rosalyne to exercise a reasonable degree of care, skill, knowledge, and judgment in the performance of its services that is ordinarily employed by building professionals in this or similar localities under the same or similar circumstances. This duty included but was not necessarily limited to exercising reasonable care <u>to ensure that WPC performed its Work</u> in completing the Project in compliance with: the Florida Building Code and other applicable codes; the prevailing industry standards; the permitted <u>plans</u>; the <u>specifications</u>; the <u>shop-drawings</u> and other submittals; manufacturers' requirements; and other approved Project documents." [D.E. 1-2, ¶ 107].

As alleged, CCM was to ensure that the work of the general contractor WPC met the quality standards specified in WPC's contract with RH. [D.E. 1-2, ¶ 9]. Judging the quality of the general contractor's work would require a special skill or some training. The work for which CCM was contracted to complete could not be done by any individual without such training.

As a result, CCM's work as a construction manager or construction consultant or any of the myriad of tasks CCM undertook falls "squarely within

the professional services exclusion. Therefore, this Court should apply the professional services exclusion and find that CIC need not defend or indemnify its Insured.

## **CONCLUSION**

The Court need only look to the allegations of the Underlying Complaint and the CIC Policies to determine the duty to defend. The Underlying Complaint specifically alleges that a contract entitled "Professional Services Agreement" required CCM to act as a "construction manager," "make site inspections," "observe the status of constructive activity," "review quality and adherence to finish quality standards," "manage" the "punch list process with the design team," supervise "management and administration of the Project and construction of the improvements," "exercise . . . the skill, knowledge, and judgment in the performance of its services that is ordinarily employed by building professionals," and "ensure that WPC performed its work in compliance with: the Florida Building Code and other applicable codes; the prevailing industry standards; the permitted plans; the specifications; the shop-drawings and other submittals; manufacturers' requirements; and other approved Project documents." Although the Court could stop its analysis with the label "Professional Services Agreement" when the Court analyzes the

allegations of the Complaint, they "arise out of the rendering or failure to render any **professional service**."

CIC is entitled to judgment on the pleadings as a matter of law and has no duty to defend CCM in the underlying litigation.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 6, 2022, I electronically filed a true and correct copy of the foregoing *Motion for Judgment on the Pleadings* with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to:

| | |
|---|---|
| Bradley J. Ellis, Esq.<br>bellis@icardmerrill.com | *Attorney for Rosalyne Holdings, LLC* |
| Todd K. Norman, Esq.<br>Todd.Norman@nelsonmullins.com | *Attorney for WPC III, Inc dba Winter Park Construction Company* |
| Trevor B. Arnold, Esq.<br>trevor.arnold@gray-robinson.com | *Attorney for Coastal Construction Management, LLC* |
| Natalie M. Yello, Esq.<br>natalie.yello@gray-robinson.com | *Attorney for Coastal Construction Management, LLC* |
| Shaina Stahl, Esq.<br>Shaina.Stahl@NelsonMullins.com | *Attorney for WPC III, Inc dba Winter Park Construction Company* |

GOODMAN MCGUFFEY LLP

By: */S/ ROBERT M. DARROCH*
ROBERT M. DARROCH
Florida Bar No. 304646
rdarroch@GM-LLP.com
6751 Professional Parkway, Suite 103
Sarasota, FL 34240-8449
(941) 953-4411 Phone
(941) 953-4410 Fax
*Attorneys for Colony Insurance Company*